UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

VITALIY DIKOV

                Plaintiff,

    v.

SOCIAL SECURITY ADMINISTRATION

                Defendant.

No. 3:13-cv-00127-AC

OPINION  AND  ORDER

Judge ACOSTA, Magistrate Judge:

*Introduction*

    Plaintiff Vitaliy A. Dikov ("Claimant") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") Under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 1381-1383(f). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C.

OPINION AND ORDER- 1                               [RMD]

§ 405(g).  Following a careful review of the record, the court affirms the decision of the Commissioner.

## Procedural Background

Claimant filed for SSI benefits July 10, 2009, alleging disability beginning February 1, 2000. (Tr. at 27.)  The Commissioner denied Claimant's application initially and on reconsideration.  (Tr. at 27.)  Claimant appeared at a hearing before Administrative Law Judge Eleanor Laws ("the ALJ"), who issued her decision finding Claimant was not disabled.  (Tr. at 38.)  Claimant timely requested review of the ALJ's decision, and the Appeals Council denied his request, making the ALJ's opinion the Commissioner's final decision.  Claimant filed for review of the decision in this court on January 23, 2013.

## Factual Background

Claimant was born in the Ukraine and emigrated to the United States in 1998.  (Tr. at 102.) Prior to moving to the U.S., Claimant worked as a welder for Ukraine Coal Company and as an office clerk for the Ukranian Army.  (Tr. at 168.)  After settling in this country, Claimant held two jobs, one as a welder and the other working an industrial sander.  (Tr. at 165-167.)  In June 1999, Claimant suffered a vertebral injury while positioning a heavy piece of metal at work.  (Tr. at 469.) He continued working for about a week, but soon stopped working and sought treatment for the acute pain.  (Tr. at 469.)  He has not been employed since.  (Tr. at 165.)

I.  Medical Facts

After Claimant's on-the-job injury, he sought treatment by Dr. Eric Long ("Dr. Long").  Dr. Long became Claimant's treating physician.  (Tr. at 469.)  Dr. Long performed extensive testing on Claimant, including physical examinations and electrodiagnostic tests of Claimant's nerves.  (Tr. at

OPINION AND ORDER- 2                                             [RMD]

469-74.)  Dr. Long consistently diagnosed Claimant with a T89 thoracic disc injury and ulnar compression.  (Tr. at 413-32, 469-88.)  In January 2001, based on "lateral imaging," Dr. Long determined Claimant had an "anterior annular tear."  (Tr. at 487.)  Dr. Long's report from May 2009 indicates a diagnosis of "T89 disc lesion, documented 3.29.00.  03.09.02, unchanged 01.28.08" and ulnar nerve compression in Claimant's elbows.  (Tr. at 415-16.)  On May 12, 2010, Dr. Long completed and endorsed a form prepared by Claimant's counsel in which he concluded "Mr. Dikov's medical conditions . . . [make] it unlikely that he could perform any physical work activity on a regular and continuing basis," and that Dikov would likely "miss two or more days of work each month due to symptoms and/or the need to lie down or seek medical treatment . . . ."  (Tr. at 397-99.)

Early on in Claimant's treatment, he sought the opinion of Dr. Victoria Carvalho ("Dr. Carvalho").  (Tr. at 444-464.)  Dr. Carvalho treated Claimant between June 1999 and March 2000 and observed that Claimant consistently reported pain in his lower and mid-back despite temporarily being on a leave of absence from his job, which required him to crouch and stoop on a regular basis.  (Tr. at 464.)  In Dr. Carvalho's most recent report, she noted that Claimant had 5/5 bilateral strength in his shoulder abductors, adductors, forward flexors, biceps, triceps, and wrists, and concluded Claimant had a cervical and thoracic sprain.  (Tr. at 463.)  Dr. Carvalho also adopted the conclusion of Claimant's physical therapist that he "was able to work in the medium category with 35 pounds of occasional lifting with maximum lifting of 47 points . . . ."  (Tr. at 464.)

In April 2010, Claimant saw Dr. Curtis Hill to review the results of a recent MRI.  (Tr. at 467-68.)  Dr. Hill opined in his report that Claimant's MRI results are within the normal range.  (Tr. at 468.)  He also noted that Claimant took no medication on a sustained basis and was in relatively good health.  (Tr. at 467.)  Further, Dr. Hill explained that he was "at a loss to explain why

[Claimant] has the symptoms that he does in his chest and back" as Dr. Hill could "find anything neurosurgically wrong with him." (Tr. at 468.)

Between 2008 and 2010, Claimant was examined by several more doctors in hopes of developing evidence to support his claim for SSI. In March 2008, Claimant was examined by Dr. Jason Mauer ("Dr. Mauer"). (Tr. at 389.) Dr. Mauer observed that Claimant had normal gait and motor strength, but upon analyzing Claimant's first MRI, concluded that Claimant had a "T8-9 disk disruption with positive provocative discography." (Tr. at 389.) Dr. Mauer diagnosed Claimant with "[m]ild deconditioning with fear-pain avoidance behavior pattern." (Tr. at 389.) In June 2008, Claimant was referred to Dr. Jung Yoo ("Dr. Yoo") for a second analysis of Claimant's 2008 MRI and to discuss possible surgical options to address his pain. (Tr. at 349.) Dr. Yoo explained to Claimant that the MRI "shows a very minor disc bulge at t8-9 without any significant neurocompression." (Tr. at 349.) Dr. Yoo concluded that Claimant was experiencing "non-physicologic symptoms" which would likely be exacerbated by surgery. (Tr. at 349.)

At the request of the Commissioner, Claimant was examined by consultive physician Dr. Amy Cowan ("Dr. Cowan"). (Tr. at 372-376.) Dr. Cowan did a full orthopedic examination and diagnosed Claimant with "thoracic spine pain with reported T8-T9 disk injury, without any significant findings on physical examination or radiographic findings" and "subjective depression" without suicidal ideation. (Tr. at 375.) Dr. Cowan also gave a functional assessment in which she determined Claimant had no limitations on his functional capacity except that he could lift and carry a maximum of fifty pounds occasionally and twenty-five pounds frequently. (Tr. at 376.)

Just days after seeing Dr. Cowan, nonexamining physician Dr. Neal E. Berner ("Dr. Berner") released his report and Residual Functional Capacity Assessment based on Dr. Berner's review of

OPINION AND ORDER- 4                                    [RMD]

Claimant's then-existing medical records. (Tr. at 377-84.) Dr. Berner noted that there was no imaging evidence in Claimant's file demonstrating that Claimant suffered from a disabling condition. (Tr. at 384.) On this basis, Dr. Berner concluded Claimant was capable of medium-level exertion, could occasionally lift fifty pounds, could frequently lift twenty-five pounds, could stand and/or walk for six hours per day, and could sit for roughly six hours per workday, but had no other functional limitations. (Tr. at 380-382.)

In 2010, Claimant underwent a third MRI. The results were analyzed by Dr. Melba Nagy ("Dr. Nagy"). (Tr. at 400.) Dr. Nagy summarized her observations as follows:

> Anatomic alignment of the thoracic spine is within normal limits. Thoracic vertebral body height is well maintained. The thoracic spinal cord is normal in signal and morphology. The bone marrow signal is unremarkable. At T8-9, there is a small central disk protrusion with mild effacement of the anterior thecal sac. A small Schmorl's node is again noted within the superior endplate of T12.

(Tr. at 400.) On the basis of Claimant's MRI, Dr. Nagy concluded that Claimant suffered from a "[s]mall central disk protrusion at T8-9 which is not significantly changed from prior exam." (Tr. at 400.)

Most recently, Claimant sought an examination by Dr. Francisco X. Soldevilla ("Dr. Soldevilla"). (Tr. at 403-04.) Dr. Soldevilla administered a physical examination and neurological examination. (Tr. at 404.) The only portion of that exam which indicated anything abnormal was the MRI scan, which showed "a small disc herniation at T8/9." (Tr. at 404.) Dr. Soldevilla opined that Claimant's thoracic pain could "possibly [be] due to his T8/9 disc herniation. (Tr. at 404.).

///

///

///

OPINION AND ORDER- 5                                              [RMD]

II.  The ALJ's Findings

The ALJ engaged in the five-step "sequential evaluation" process for evaluating SSI claims. 20 C.F.R. § 416.920.  (Tr. at 29-37.)  The Claimant bears the burden of proof at steps one through four, but the burden of production shifts to the Commissioner at step five to identify jobs existing in significant numbers in the national economy that the claimant can perform despite his or her residual functional capacity, age, education, and work experience.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).  Each step is potentially dispositive.  20 C.F.R. § 416.920(a)(4).

A.  *Steps One and Two*

At step one, the ALJ determined that Claimant had not engaged in substantial gainful activity since his application date.  (Tr. at 29.)  At step two, the ALJ determined Claimant's only severe impairment was degenerative disc disease.  (Tr. at 29.)  The ALJ recognized, and briefly discussed, Claimant's allegations that he suffered from ulnar compression in the elbows and paresthesia in the ulnar distribution, but according to the ALJ, Claimant's paresthesia was not medically determinable because there was insufficient objective medical evidence to support the diagnosis.  (Tr. at 29.)

The ALJ also concluded that "[C]laimant's medically determinable medical impairment of depression does not cause more than minimal limitation in the [C]laimant's ability to perform basic mental work activities and is therefore nonsevere."  (Tr. at 30.)  The ALJ came to this conclusion after reviewing the four broad paragraph B criteria and concluded Claimant: (1) had only mild limitations to his activities of daily living: (2) had no limitation in social functioning; (3) had mild limitations in concentration, persistence, or pace; and (4) experienced no episodes of decompensation of extended duration. (Tr. at 30.)

*B. Step Three*

At step three, the ALJ concluded Claimant "does not have an impairment or combination of impairments that meets or medically equals" those listed in the pertinent regulations. (Tr. at 30.) In reaching this conclusion, the ALJ explained that Claimant's degenerative disc disease did not result in limited spinal mobility, motor loss, sensory or reflex loss, or lumbar spinal stenosis. (Tr. at 31). Moreover, the ALJ determined claimant was able to ambulate effectively and experienced no "upper or lower extremity weakness, reflex loss, or objective sensory deficit." (Tr. at 31.)

*C. The Residual Functional Capacity*

In the ALJ's Residual Functional Capacity Assessment ("RFC"), the ALJ concluded that Claimant had the ability to perform light work but had the following limitations:

> He cannot climb ladders, ropes or scaffolds. He can only occasionally balance, stoop, kneel, crouch, and crawl. He can climb ramps and stairs rarely. He can no more than frequently perform handling and fingering with the right upper extremity. He can no more than occasionally reach overhead bilaterally. He must be given the option to sit or stand. He cannot perform work that requires public communication.

(Tr. at 31.)

The ALJ evaluated and considered the credibility of each witness on the record when making the RFC determination. (Tr. at 33-34.) First, the ALJ concluded the Claimant was incredible because: (1) his daily activities were inconsistent with the level of disability alleged; (2) his treatment was conservative; (3) the evidence indicated Claimant was not motivated to work consistently; and (4) Claimant took classes and actively applied for numerous jobs during the period of his alleged disability. (Tr. at 33.) The ALJ interpreted these factors to mean that Claimant was exaggerating the severity of his functional limitations. (Tr. at 33.)

Second, the ALJ gave the opinion of Dr. Berner "only some weight because the evidence

shows the claimant to be more limited." (Tr. at 34.) Third, the ALJ concluded examining physician Dr. Cowan was entitled to "some weight" for similar reasons. (Tr. at 34.) Fourth, the ALJ determined treating physician Dr. Long's opinion was entitled to "limited weight" because: (1) Dr. Long did not perform "a true physical capacity evaluation based on performance testing;" (2) he did not provide a reasoned explanation to support his opinions; and (3) the objective evidence supports a higher level of residual functional capacity. (Tr. at 34-35.)

Third, the ALJ discussed the testimony of Claimant's three lay witnesses. (Tr. at 35-36.) Claimant's friend William Woodrow ("Woodrow") testified that Claimant's conditions "affect his ability to lift, squat, bend, stand, reach, walk, sit , kneel, climb stairs, remember, complete tasks, concentrate, use his hands, and get along with others." (Tr. at 35.) Woodrow explained that Claimant was "once a powerful weightlifter," but is now unable to engage in many of his favorite leisure activities. (Tr. at 35.) The ALJ gave Woodrow's testimony "some weight because it is generally consistent with the claimant's statements." and tended to show that Claimant was still capable of some residual functioning. (Tr. at 35.) The ALJ also gave "some weight" to the testimony of Claimant's son Vasily Dikov ("V. Dikov"). (Tr. at 36.) V. Dikov testified about Claimant's pain and how it interfered with his ability to attend church, drive, and attend school events. (Tr. at 36.) Finally, the ALJ assessed the credibility of Yuriy Frolov ("Frolov"), Claimant's brother-in-law. (Tr. at 36.) Frolov testified that after Claimant suffered a work-related back injury in 1999, he had difficulty lifting his twenty-pound daughter, experienced depression, and was unable to attend many family gatherings. (Tr. at 36.) The ALJ interpreted his testimony to mean Claimant "continued to camp, drive, and attend church and family gatherings after injuring his back." (Tr. at 36.) The ALJ gave Frolov's statement "limited weight because Mr. Frolov did not describe the basis for his

knowledge of the claimant's condition . . . [or the] frequency of his interaction with claimant." (Tr. at 36.)

### D. Step Four

At step four, the ALJ determined that Claimant was unable to perform any of his past work as a sander or welder due to his functional limitations. (Tr. at 36-37.)

### E. Step Five

At step Five, the ALJ determined that, considering Claimant's age, education, work experience, and RFC, Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 37.) Based on the testimony of the Vocational Expert ("VE"), the ALJ determined that Claimant's residual functional capacity allows him to perform work as a cafeteria attendant and a small products assembler. (Tr. at 37.) Because Claimant could perform work in the national economy, the ALJ held Claimant was not disabled under the SSA. (Tr. at 37-38.)

### Discussion

Plaintiff argues the court should reverse and remand for an award of benefits because the ALJ: (1) failed to recognize all of Claimant's severe disabling conditions; (2) failed to define the parameters of the sit-stand option in Claimant's RFC; (3) erroneously relied upon VE testimony that diverged from the dictionary of occupational titles ("DOT") without adequate explanation; (4) unjustifiably found Claimant's testimony incredible; (5) unjustifiably rejected the credibility of Claimant's treating specialist, Dr. Long; and (6) improperly rejected the testimony of Woodrow. The court will address each in turn.

///

///

I.  Failure to Recognize All of Claimant's Severe Disabling Conditions

The ALJ concluded at step two of the five-step deliberative process that Claimant suffered from only one severe impairment: degenerative disc disease.  Claimant contends that this was error because he also suffered from an "annular tear."  The Commissioner argues that the ALJ was fully justified in finding only one severe condition, and to the extent the ALJ's finding was error, it was harmless.  The court agrees with the Commissioner.

An impairment is severe if it "significantly limits an individual's physical or mental abilities to do basic work activities." S.S.R. 96-3p, *available at* 1996 WL 374181, at *1 (1996).  Non-severe injuries are those which have "no more than a minimal effect on the ability to do basic work activities." *Id.*  However, the severe-impairment analysis at step-two is driven primarily by the symptoms caused by the severe impairment. *Id.* at *2.  Once a claimant puts forth sufficient objective evidence of an impairment "the intensity, persistence, and limiting effects of the symptom(s) must be considered along with the objective medical and other evidence in determining whether the impairment or combination of impairments is severe." *Id.*

The description of Claimant's injury is inconsistent throughout the record.  In 2001, Dr. Long described the injury as an "annular tear" and "disc herniation," and Dr. Young described the injury as a "very minor, shallow degenerative disc bulge which does not compress the spinal cord." (Tr. at 487, 490, 495.)  Later, Dr. Yoo, reviewing a 2008 MRI, noted Claimant "shows a very minor disc bulge at t8-9 without any significant neurocompression." (Tr. at 349.)  After reviewing the same MRI images, Dr. Soldevilla described the condition as a "disc herniation."  Most recently, Dr. Nagy administered another MRI and concluded Claimant had a "small central disk protrusion with mild effacement of the anterior thecal sac." (Tr. at 400.)  To properly determine whether the ALJ

OPINION AND ORDER- 10                                                    [RMD]

committed error on step two, it is necessary to briefly review medical information on intervertebral disc injuries.

Intervertebral disc lesions, or tissue irregularities in the cartilage-and-fluid disks between vertebrae, come in several varieties. ROSCOE N. GRAY, M.D. & LOUISE J. GORDY, M.D., LL.B., ATTORNEYS' TEXTBOOK OF MEDICINE, ¶ 15.21 (Matthew Bender & Co., Inc., 3d ed., 2000). Even with advanced medical imaging, labeling a patient's specific type of lesion may be difficult, as intervertebral injuries are often difficult to distinguish. *Id.* Degenerative disc disease is a common cause of intervertebral lesions. *Id.* at ¶ 15.22. As individuals age, the tissue of the intervertebral disks changes and often weakens. *Id.* The weakened disk often results in "fissures and fractures . . . in the annulus," or the cartilage wall of the vertebral disk. *Id.* at ¶ 15.21. The weakened disk can then bulge or protrude which can in turn put pressure on the nearby nerve tissue. *Id.* "This protrusion is not a classic herniation, but may progress to a true herniation, in which disc material is displaced." *Id.*

> A number of terms have been used to describe protruding intervertebral discs. For example, a "bulging" disc usually refers to diffuse extension of the disc margin in all directions. *Id.* In general, a "herniation" describes a focal displacement of nuclear, annular or end plate material beyond the normal peripheral margins of the disc. *Id.* Where there is a complete annular tear in the disc, it is usually referred to as a disc rupture. While rupture may be present without any herniation, a disc herniation is always associated with disruption of the annulus.

*Id.* (internal citations omitted).

Here, the ALJ clearly recognized the full extent of Claimant's spinal injury. The ALJ noted in his opinion that "[t]he objective medical evidence reveals a small disc herniation at the T8-9." Because "disc herniation is always associated with disruption of the annulus," the ALJ's opinion necessarily recognized that Claimant suffered from a loss of annular integrity. It is clear the ALJ

considered this evidence when assessing Claimant's RFC. Immediately after discussing the objective evidence of disc herniation, the ALJ concludes, "[t]he evidence supports a limitation to less than the full range of light work, with nonexertional limitations noted in the [RFC]." Thus, even if the ALJ did not articulate Claimant's disc herniation or annular tear as separate and distinct severe impairments, he considered their symptoms when formulating Claimant's RFC, and would have come to the same ultimate disability determination regardless.

Even if the ALJ had erred by failing to fully account for the actual severity of Claimant's injury at step two, that error was harmless. Whether a claimant's disability precludes his or her ability to work depends not on the number of individual impairments the claimant has, but the severity of the claimant's symptoms. *See Robbins v. Soc. Sec. Admin*, 466 F.3d 880, 883 (9th Cir. 2006) ("In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including . . . the effects of symptoms . . . that are reasonably attributed to a medically determinable impairment."). Thus, the RFC is defined by the Claimant's symptoms. So long as the ALJ bases the RFC on an accurate representation of Claimant's symptoms, failure to identify the medical source of those symptoms would not alter the ultimate disability determination. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (finding harmless an ALJ's failure to find bursitis to be a severe impairment because the ALJ discussed the claimant's bursitis at step four and considered all of claimant's limitations when creating the RFC.)

## II. Sit-stand Option

The ALJ's RFC provides that Claimant "must be given the option to sit or stand," and included "an option to sit or stand" in his hypothetical questions to the VE. (Tr. at 31, 72.) Claimant alleges that the ALJ erred by including a sit-stand option in Claimant's RFC without determining

how often Claimant must change positions. Claimant also argues that, because the Dictionary of Occupational Titles ("DOT") contains no reference to positions which can be performed with a sit-stand option, the VE's testimony cannot constitute substantial evidence to support the ALJ's finding of no disability. The Commissioner contends that failing to specify the frequency with which Claimant must change positions was not error, and that the ALJ did not err by relying on the VE's expert opinion testimony on the requirements of positions featured in the DOT. The court disagrees with the Claimant and concludes that, by providing for a sit-stand option as opposed to a sit-stand alternative, the ALJ properly identified the bounds of claimant's sit-stand requirement.

A. *Temporal Restrictions on the Sit-Stand Option*

Due to painful conditions, some social security claimants are unable to sit or stand for long periods of time. S.S.R. 96-9P, *available at* 1996 WL 374185, at *7 (1996). "Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded." *Id.* When this is the case, the ALJ must prompt the VE to identify vocations in which would accommodate an employee who must periodically alternate between a sitting and standing position. *Id.* When the ALJ includes a sit-stand alternative in the RFC, the ALJ "must be specific as to the frequency of the individual's need to alternate sitting and standing." *Id.*

But the ALJ in this case specified that Claimant have a sit-stand *option*, not a sit-stand *alternative*. Review of the law surrounding this issue reveals that, while similar, a sit-stand alternative is a concept distinct from a sit-stand option. In *Larkin v. Astrue*, the Ninth Circuit reasoned that a "sit-stand option . . . is most reasonably interpreted as sitting or standing 'at will.'" 450 Fed. Appx. 626, 627 (9th Cir. 2011). Similarly, courts in this district have rejected arguments

similar to that now advanced by Claimant and held that, "common sense dictates that a 'sit/stand option' means exactly what it says; [the claimant] must have the option to either sit or stand at work. This is consistent with a requirement that [the clamant] have the ability to 'sit or stand at will.'" *Swofford v. Comm'r Soc. Sec. Admin.*, No. 3:12-cv-00557-MA, 2013 WL 3333063, at *6 (D. Or. July 1, 2013); *See also Rowland v. Colvin*, 3:12-cv-00549-HU, 2013 WL 5330611, at *10 (D. Or. Sept. 3, 2013) (coming to the same conclusion as the *Swofford* court.). Thus, according to those courts, because a claimant with a sit-stand option must be able to alternate between sitting and standing at will, it is a separate and distinct concept from the sit-stand alternative, the temporal parameters of which the ALJ must specifically define in the RFC.

The language of Social Security Ruling 83-12 supports the Ninth Circuit's interpretation of "sit-stand option." Following a brief discussion regarding the definition of the "alternate sitting and standing" requirement, the S.S.R. explains:

> There are some jobs in the national economy – typically professional and managerial ones – in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable fo transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to stand, a VS should be consulted to clarify the implications for the occupational base.

S.S.R. 83-12, *available at* 1983 WL 312523, at *4 (1983).

S.S.R. 83-12 recognizes that some vocations will allow a worker to sit or stand "with some degree of choice," and urges the ALJ to consult a VE to clarify the implications of a sit-stand alternative and determine whether specified jobs will accommodate such a limitation. *Id.* The key language in the above-quoted excerpt, which corresponds to the *Swofford* court's definition of sit-

OPINION AND ORDER- 14                                              [RMD]

stand option is "a degree of choice." *Id.* A sit-stand option, as contemplated by the *Swofford* court and the ALJ in this case, is a sit-stand alternative under which the employee has an unlimited "degree of choice" regarding the position in which he or she works. When the ALJ included a sit-stand option in Claimant's RFC, he concluded that Claimant could work only those jobs which allowed an employee to freely choose his or her working posture, and did not "demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task." *Id.* at *4. Therefore, the ALJ did not err by failing to define the bounds of Claimant's sit-stand alternative because, by requiring positions with a sit-stand option, he determined that the bounds of Claimant's sit-stand alternative be limited only by Claimant's own discretion. Thus, the court concludes that the ALJ did not commit prejudicial error in this respect.

### B. Vocational Expert Testimony

Claimant also argues that inclusion of the VE's testimony in the record as reliable evidence is contrary to the law because it contradicted the dictionary of occupational titles ("DOT"). Specifically, Claimant contends the DOT does not describe any vocation to include a sit-stand option, thus the VE's departure from those criteria constitutes reversible error. The court disagrees.

An ALJ may rely on the testimony of a VE identifying vocations in which a claimant may participate given his or her RFC. *See* S.S.R. 83-12, at *2 ("A [VE] can assess the effect of any limitation on the range of work at issue . . . [and] advise whether the impaired person's RFC permits him or her to perform substantial numbers of occupations within the range of work at issue . . . ."). However, the VE's testimony constitutes reliable evidence only if it is consistent with the DOT. S.S.R. 00-4p, *available at* 2000 WL 1898704, at *2 (2000); *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). The ALJ "has an affirmative responsibility to ask about any possible conflict

between that [VE] . . . evidence and information provided in the DOT." S.S.R. 00-4p, at *2. Regulations further require the ALJ to specifically ask the VE "if the evidence he or she has provided" is consistent with the DOT, and require a reasonable explanation in the event of a conflict. *Id.*, *Massachi*, 486 F.3d at 1152-53. Failure to do so is reversible error. *Id.*

No job in the DOT identifies a sit-stand option, but Social Security regulations nonetheless stipulate that many professions allow the employee a significant degree of postural flexibility. S.S.R. 83-12, at *4. That regulation then directs decisionmakers to consult with a VE to "clarify the implications for the occupational base" when a claimant's RFC contains a sit-stand alternative. By omitting a sit-stand option from the DOT while recognizing it is occasional necessity, the Social Security Administration signified their intent that ALJs rely on a VE's expertise in the area of vocational requirements when identifying vocations which include a sit-stand option.

In *Rowland v. Colvin*, the court recognized that an ALJ may rely on VE testimony which expounds on DOT vocational definitions. 2013 WL 5530611, at *11. There, as here, the Claimant urged the court to reverse the ALJ's decision for relying on VE testimony which included a sit-stand option. *Id.* "[T]he DOT classifies work as either 'light' or 'sedentary,' as between the two categories, and does not refine categories further." *Id.*, *citing Distasio v. Shalala*, 47 F.3d 348, 350 (9th Cir. 1995). The VE is entitled to rely on labor market surveys and his or her own experience when determining whether the vocations identified fall within subcategories that may support a sit-stand option. *Rowland*, 2013 WL 5530611, at *11-12.

Here, the ALJ properly relied upon the VE's testimony. First, the ALJ fulfilled his duty to ensure the VE's testimony was consistent with the DOT. Before posing the hypothetical question, the ALJ asked the VE: "If you testify in a manner than conflicts with the information in the

[RMD]

Dictionary of Occupational Titles, can you please advise us of the conflict as well as the basis for your testimony?" (Tr. at 70:4-7.) When the VE did not indicate that the sit-stand option contradicted the DOT, the ALJ reasonably relied on the VE's testimony. Second, the VE's testimony did not contradict the DOT. Although no DOT vocation expressly includes a sit-stand option, the Commissioner nonetheless recognizes that some positions may accommodate a sit-stand option. The VE determined, according to his expertise and professional experience, that Claimant could work several positions despite his requirement of a sit-stand option. Thus, the ALJ did not err.

II. Credibility Determinations

      Claimant argues that the ALJ erred in making three credibility determinations. First, he alleges the ALJ failed to provide adequate justification for rejecting the Claimant's testimony. Second, he challenges the ALJ's credibility determination with respect to Dr. Long. Third, Claimant contends the ALJ did not provide germane reasons for rejecting the testimony of Mr. Woodrow. The Commissioner argues that the ALJ sufficiently justified her credibility determinations and, to the extent she did not, the error was harmless.

    *A. Rejecting Claimant's Testimony*

      Claimant alleges that the ALJ erred by unjustifiably rejecting the claimant's own testimony about his symptoms and their limiting effects. The ALJ determined "[C]laimant's functional limitations are not as significant as he alleged" because: (1) his daily activities were inconsistent with the limitations alleged; (2) his pain treatment was "conservative," and Claimant did not utilize medication to relieve his pain; (3) the evidence suggests Claimant was unmotivated to work; and (4) despite alleging disability, the Claimant regularly attended classes and actively applied for work in 2006 and 2007.

                                            [RMD]

The ALJ may consider a number of factors in weighing a claimant's credibility, including: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir.2008). Further, when the claimant's testimony deals with his subjective pain levels, the ALJ must perform a two-step process to evaluate the credibility of subjective testimony. *Id.* Step one requires the claimant to produce objective medical evidence of an impairment "that could reasonably be expected to produce some kind of symptom." *Id.* If the claimant meets his burden on the first step, the ALJ moves to step two where the he or she must accept the claimant's testimony regarding the severity of her symptoms unless there is affirmative evidence of malingering or the ALJ determines there are specific clear and convincing reasons for rejecting the claimant's credibility. *Id.*

The Commissioner argues that the Ninth Circuit's "clear and convincing" standard is "inapposite to 42 U.S.C. § 405(b)(1), which provides that the ALJ's decision need only set forth the reasons for the decision in understandable language . . . [and] the 'substantial evidence' review standard specified by 42 U.S.C. § 405(g)." (Def.'s Opening Brief at 7-8.) The court disagrees with the Commissioner. The court may reverse an ALJ's decision which sets forth "reasons for the decision in understandable language" if those reasons are arbitrary and capricious. 5 U.S.C. § 706(2)(A). The "clear and convincing" standard is merely the Ninth Circuit's test to determine whether the ALJ's justification for rejecting claimant's testimony is legally sufficient and non-arbitrary. *Tommasetti*, 533 F.3d at 1039.

OPINION AND ORDER- 18                                                        [RMD]

1. Daily Activities

The ALJ first rejected Claimant's testimony because Claimant's daily activities suggested a much higher functional capacity than Claimant alleged. Notably, the ALJ determined that the Claimant's daily activities, which included frequently watching movies, driving his children to school, shopping for groceries once per week, doing occasional yard work, watching his children, preparing meals, and performing household chores, were inconsistent with Claimant's allegation that he was unable to sit, stand, or walk for more than fifteen minutes at a time.

A claimant need not "vegetate in a dark room" to be eligible for social security benefits, and the court should not penalize a claimant for attempting to lead a normal life. *Cooper v. Bowden*, 815 F.2d 557, 561 (9th Cir. 1987). However, an ALJ may reject a claimant's testimony regarding his or her limitations if the claimant's daily activities are inconsistent with the alleged functional capacity. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("[Claimant's] testimony was somewhat equivocal about how regularly she was able to keep up with [her daily activities], and the ALJ's interpretation of her testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second guess it.") The ALJ's justification strengthens if the claimant "is able to spend a substantial part of [his or] her day performing household chores or other activities that are transferable to a work setting." *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996).

Similar to *Rollins*, the court finds that, while it was not the only reasonable interpretation of the evidence, the ALJ reasonably concluded that Claimant's daily activities were inconsistent with his alleged limitations. The ALJ reasonably concluded that Claimant's allegation that he could sit no longer than fifteen minutes at a time was inconsistent with "frequently" watching movies,

OPINION AND ORDER- 19                                                    [RMD]

attending church on a weekly basis, and performing yard work. It is true that each of these activities could be punctuated by periods of rest, but the ALJ's determination is nonetheless reasonable, and the court is bound to uphold it on that basis. *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).

### 2. Conservative Treatment

Second, the ALJ found the Claimant's testimony regarding his level of pain incredible because he chose a conservative course of treatment and used pain medication on a "limited" basis. (Tr. at 33.) "[A]lthough a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). Further, in *Tommasetti v. Astrue*, the Ninth Circuit confronted similar facts and upheld the decision of the ALJ. 533 F.3d 1035,1039 (9th Cir. 2008). There, the ALJ justified rejecting the claimant's credibility in part because the claimant chose a conservative course of treatment and "stopped taking an effective medication due to mild side effects. *Id.; see also Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (affirming the ALJ's "conservative treatment" rationale). As with any decision by the ALJ, though, it must be supported by substantial evidence. *Tommasetti*, 553 F.3d at 1040.

Here, the court accepts as legally sufficient the ALJ's rationale for rejecting Claimant's credibility, but concludes that the ALJ's decision was not supported by substantial evidence. The only evidence the ALJ cited in support of her "conservative treatment" rationale were Dr. Victoria Carvalho's treatment notes. Those treatment notes explain that, at the time of Claimant's examination, "[h]e [was] not taking medicine. He want[ed] to defer taking any type of medicine." (Tr. at 449.) However, the notes upon which the ALJ relies predate Claimant's alleged onset date.

(Tr. at 449). Claimant's more recent medical records indicate that he was taking medication "almost every day," to regulate his back pain. (Tr. at 173, 357, 365, 373, 488, 517.) Further, the record indicates Claimant sought surgery — a much more aggressive treatment regimen — but could not afford it and was deemed an unsuitable candidate for surgery. (Tr. at 188, 349.) The substantial weight of the evidence contradicts the ALJ's conclusion. Thus, the court concludes this was error.

### 3.  Motivation to Work, Attending Class, and Applying for Jobs

The ALJ's fourth and fifth rationales for rejecting claimant's credibility are inconsistent. First, the ALJ concluded that claimant was unmotivated to work consistently.  The ALJ cites Claimant's earnings report, which indicates Claimant worked only three years between 1985 and 2009.  However, immediately after this, the ALJ purports to reject Claimant's testimony because Claimant "took classes and actively applied for numerous jobs in 2006 and 2007." According to the ALJ, this demonstrated that the claimant "is able and willing to perform other work if given the opportunity."

While each of these justifications, taken alone, would be legally sufficient and supported by substantial evidence, taken together they are entirely inconsistent.  Given that the "substantial evidence" requires less evidence than that required under a preponderance of the evidence standard, it is theoretically possible for both of these contradictory positions to be supported by substantial evidence.  However, administrative and legal decisionmakers may not justify their decisions with diametrically contradictory positions. The Ninth Circuit said as much in *Perez v. Astrue*, 250 Fed. Appx. 774, 776 (9th Cir. 2007).  There, the ALJ rendered an inconsistent RFC by finding the claimant required a sit-stand option while simultaneously concluding the claimant could "stand and/or walk six hours in an eight-hour day." *Id.* Although *Perez* dealt with an ALJ's internally

inconsistent RFC, the Ninth Circuit has essentially found that an internally inconsistent credibility determination similarly constitutes legal error.

### 4. Harmlessness

In the Ninth Circuit, error in an ALJ's credibility determination is harmless when the record is clear that the error was inconsequential to the determination that the claimant was not disabled. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). If the ALJ's decision would have been different had the ALJ not erred in his or her analysis, the error is prejudicial and reversible. *Gunderson v. Astrue,* 371 Fed. Appx. 807, 808-09 (9th Cir. 2010). Even if an ALJ errs by discounting a witness's credibility for legally insufficient reasons, that error is harmless so long as the ALJ provides other legitimate reasons for his or her decision. *See Carmickle,* 533 F.3d at 1162 (finding harmless an ALJ's rejection of a witness's testimony on erroneous grounds because the ALJ provided other legitimate reasons for rejecting the witness's testimony). Here, the ALJ did just that and the court thus concludes her error was harmless.

### B. Credibility of Treating Physician Dr. Eric Long

Claimant argues the ALJ erred in rejecting the opinion of his long-time treating physician Dr. Long. Claimant alleges that, although the ALJ provided specific and legitimate reasons for rejecting Dr. Long's opinion, he failed to "analyze the six regulatory factors" articulated in 20 C.F.R. § 404.1527. The court disagrees with Claimant.

Where a record contains conflicting medical evidence, "the ALJ is charged with determining credibility and resolving the conflict." *Chaudhry v. Astrue,* 688 F.3d 661, 671 (9th Cir. 2012). In assessing credibility, the ALJ should "consider the medical opinions in [the] case record together with the rest of the relevant evidence . . . ." 20 C.F.R. § 404.1527. Under section 404.1527, an ALJ

is required to consider six factors when weighing medical opinions: (1) the examining relationship; (2) the treatment relationship; (3) the objective support for the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the doctor was a specialist or not; and (6) other factors persuasive to the ALJ. An ALJ "need not accept the opinion of a physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Chaudhry*, 688 F.3d at 671. However, the Ninth Circuit does not require an ALJ to articulate his or her findings on each factor. Instead, the ALJ need only provide clear and convincing reasons to reject a treating physician's uncontradicted opinion. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). Where a treating physician's opinion is contradicted by that of another physician on the record, the ALJ may discount the credibility of the treating physician for specific and legitimate reasons. *Id.* "An ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." *Tommasetti*, 553 F.3d at 1041, *quoting Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Dr. Long's opinion is contradicted by the opinions of Dr. Berner and Dr. Cowan, so the ALJ need only provide specific and legitimate reasons for rejecting Dr. Long's conclusion. Here, the ALJ provided two reasons for rejecting Dr. Long's opinion. First, the ALJ determined Dr. Long's opinion was inconsistent with the objective evidence. In support of her conclusion, the ALJ cited Dr. Long's opinion that claimant could "never bend, stoop, twist, [or] crouch " and could lift and carry five pounds occasionally. Conversely, Dr. Mauer found that Claimant could perform "a full squat and rise to completion without difficulty" and had full symmetric motor strength. Dr. Long did not even administer a "squat and rise" test prior to concluding Dikov could not stoop, twist, or crouch.

[RMD]

During Claimant's initial visit, Dr. Long administered a comprehensive physical examination which included range of motion tests on Dikov's neck, back, and arm joints; reflex tests; and electrodiagnosis studies. (Tr. at 418-421.) At subsequent appointments, Dr. Long's physical examination was cursory at best, and generally consisted of a vertebral range of motion test and a test of Claimant's reflexes. (Tr. at 415.) At no point did those tests provide evidence sufficient for Dr. Long to conclude that Claimant could not bend, stoop, twist, or crouch.

Second, the ALJ rejected Dr. Long's opinion because it was short, conclusory, and failed to "explain how [his] findings support [Claimant's] level of restriction." For example, the ALJ cites a questionnaire completed by Dr. Long where he stated that Claimant is disabled because he has "thoracic disc disruption that causes pain" and did not comment on the severity or frequency of the pain or "comment on the efficacy of treatment, such as pain medication." (Tr. at 34-35.) Although Dr. Long's treatment notes are voluminous, his official medical opinions rendered for the purpose of Claimant's disability application are short and conclusory. Further, the "questionnaire" the ALJ refers to is a three-page document prepared by Claimant's attorney which states a number of positions and requests Dr. Long to mark each as "true" or "false." The only opinion Dr. Long articulated in narrative form was in response to the question "if [Claimant] is restricted to the current course of treatment what is your prognosis . . .?" (Tr. at 399.) Dr. Long wrote, "Poor for symptom relief or return to work; chance of spontaneous healing < 1%." (Tr. at 399.) The court agrees with the ALJ that Dr. Long's opinion was brief, conclusory, and inconsistent with some of the objective evidence on the record. Therefore, the ALJ did not err by not fully crediting Dr. Long's opinion.

///

///

OPINION AND ORDER- 24                                          [RMD]

C. Lay Testimony of William Woodrow

Last, Claimant argues that the ALJ erred by failing to credit the testimony of Woodrow, a lay witness. Woodrow completed a "third-party" functional report as part of Claimant's disability application in which he recorded his observations of Claimant's functional limitations. In that report, Woodrow explained that Claimant has difficulty sleeping, dressing himself, bathing, and performing daily activities, but can drive to the store, do basic yard work, and can cook meals. Further, Woodrow opined that Claimant can lift five pounds maximum and can no longer fish, hike, or swim as frequently as he once did. The ALJ gave Woodrow's opinion "some weight because it is generally consistent with [C]laimant's statements." However, the ALJ considered the opinion "with caution" because Woodrow "has a personal relationship with the claimant and lacks the expertise and possibly the motivation to offer an objective or functional assessment."

An ALJ must consider nonmedical evidence by individuals with knowledge of the claimant's functioning. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974-75 (9th Cir. 2000). However, an ALJ may discount lay opinions "by providing 'reasons that are germane to each witness.'" *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

The ALJ discounted Woodrow's testimony because Woodrow lacked medical expertise and has a close relationship with Claimant. Neither rationale is germane to Woodrow. First, courts have repeatedly held that lack of medical expertise is not a sufficient reason for discounting lay testimony. By definition, all lay testimony is given by those who lack medical expertise. *Steiner v. Colvin*, No. 6:11–cv–06425–JE, 2013 WL 3791480, at *13 (D. Or. July 19, 2013). Permitting an ALJ to discount lay testimony simply because the witness is a layperson would directly contradict the

requirement that the ALJ consider all non-medical evidence by individuals with knowledge of the claimant's functioning. *Smolen*, 80 F.3d at 1288-89.

Similarly, allowing an ALJ to discount lay testimony because the witness "has a personal relationship" with the claimant would render nearly all lay testimony incredible. *Id.* at 1289. Individuals who have a close relationship with a claimant and interact with him or her on a daily basis would naturally be most knowledgeable of the claimant's functioning. *Id., Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). To credit lay testimony only when provided by disinterested strangers is inconsistent with the importance the Social Security Act attaches to lay testimony. *Id.* Thus, the court concludes that the ALJ erred by failing to provide legally sufficient reasons for rejecting Woodrow's testimony.

Although the ALJ erred by failing to properly explain her treatment of Woodrow's testimony, the court concludes it was harmless error. Where the ALJ expressly but erroneously discredits testimony, the court may find the error harmless if the Commissioner's decision would have remained unchanged absent the ALJ's error. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054-55 (9th Cir. 2006). Here, Woodrow explains in his witness statement that, although Claimant can no longer perform many of the strenuous activities he once could, he can still perform yard work and household chores, can cook meals and do grocery shopping, and can still attend family gatherings and church. (Tr. at 181-88.) The ALJ reasonably concluded that Woodrow's third-party report paints Claimant as a relatively high-functioning claimant. Although Woodrow's statement demonstrates that Claimant experiences pain and has difficulty engaging in activities he once could perform without impediment, when fully credited the statement's evidentiary weight is not so significant that it renders the ALJ's ultimate disability determination unsupported by the substantial

evidence. The court cannot conclude that the ALJ's decision would have changed had she fully credited Woodrow's statement. Thus, the ALJ's error in failing to provide germane reasons for rejecting Mr. Woodrow's testimony was harmless and the court will not reverse

<em>Conclusion</em>

The court finds that, although the ALJ committed several errors of law, each was harmless. Therefore, the ALJ's May 26, 2011, opinion (Dkt. #1) denying Claimant an award of benefits is AFFIRMED.

DATED this 13th day of November, 2014.

IT IS SO ORDERED

JOHN V. ACOSTA
United States Magistrate Judge